**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:09cv159**

| | |
|---|---|
| **In re the Application of** ) | |
| ) | |
| **SUSANNE NEVES,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **MEMORANDUM OF** |
| _____ ) | **DECISION AND ORDER** |
| **ERICO FERREIRA NEVES,** ) | |
| **BARTHI PATEL, and MAHESH** ) | |
| **PATEL,** ) | |
| ) | |
| **Respondents.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Petitioner's Expedited Petition for Return of Children to Petitioner and Expedited Petition for Immediate Issuance of Show Cause Order to Respondent ("Petition") [Doc. 1] and the Petitioner's Application for Attorney Fees and Expenses [Doc. 20].

## I.  PROCEDURAL HISTORY

On April 16, 2009, the Petitioner Susanne Neves, a German citizen, filed the instant Petition against her estranged husband, Respondent Erico

Ferreira Neves ("Respondent Neves"), and Respondents Barthi Patel and Mahesh Patel ("Respondent Patels" or "the Patels"), seeking the return of the Neves's two minor children to Germany pursuant to the Hague Convention on Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501 ("Hague Convention")[1]; the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 *et seq.* ("ICARA"); and N.C. Gen. Stat. Ann. § 50A-302 *et seq.* Specifically, the Petitioner alleges that on or about February 15, 2009, Respondent Neves wrongfully removed the parties' two children from their habitual residence in Germany and since that time has wrongfully retained them in the United States. The Petitioner further alleges that the Respondent Patels assisted Respondent Neves in wrongfully removing the children to this District and in wrongfully retaining the minor children in the United States by allowing them to reside in the Patels' home, located in Matthews, North Carolina. [Doc. 1].

Along with the Expedited Petition, the Petitioner filed an Expedited *Ex Parte* Motion for Pick-Up Order and Expedited Service and Surrender of Passport and Travel Documents. [Doc. 2]. On April 16, 2009, the Court

---

[1] The Convention came into effect in the United States on July 1, 1988 and was ratified between the United States and Germany on December 1, 1990.

granted this motion and directed the United States Marshals to take custody of the minor children and to seize Respondent Neves's and the minor children's passports and travel documents. The Court further set the Expedited Petition for a final hearing to occur on May 1, 2009. [Doc. 4]. The Court entered an Amended Order on April 17, 2009, directing the United States Marshals Service to deliver custody of the minor children to the Mecklenburg County Department of Social Services ("Youth & Family Services") pending further Order of the Court and ordering the Petitioner to surrender her passport and travel documents as well. [Doc. 6]. On April 17, 2009, the United States Marshals delivered the minor children to the custody of Youth & Family Services, and took possession of the parties' passports and travel documents, which were subsequently deposited with the Court for safekeeping pending a final hearing in this case.

On April 24, 2009, the Court conducted a hearing to determine the need for continued nonsecure custody of the minor children pending the May 1, 2009 hearing. Both the Petitioner and Respondent Neves were present at this hearing, and both were represented by counsel.[2] Upon agreement of the parties, the Court concluded that there was no longer a

---

[2]Despite being served with a copy of the Petition, the Patels have not made an appearance in this action.

need for Youth & Family Services to exercise nonsecure custody of the minor children, and therefore ordered that custody of the minor children be transferred to the Petitioner pending the final hearing.  [Doc. 11].

On April 30, 2009, attorney Bradley B. Honnold entered an appearance on behalf of Respondent Neves [Doc. 13], and a motion was filed seeking a continuance of the May 1, 2009 hearing on the grounds that Respondent Neves and his newly retained counsel needed more time to adequately prepare.  [Doc. 14].

At the May 1, 2009 hearing, Respondent Neves stated an additional ground for his request for a continuance, arguing that additional time was needed in order to secure psychological evaluations of the minor children, and that such evaluations would provide evidence to the Court regarding the risk of harm posed to the children if they were ordered to return to Germany.  The Court gave the parties until May 4, 2009 to file additional authorities regarding the propriety of Respondent Neves's request for psychological evaluations.  [See Docs. 15, 16].  The Court then proceeded with an evidentiary hearing on the Petitioner's Expedited Petition, at which both the Petitioner and Respondent Neves testified and submitted documentary evidence.

On May 6, 2009, the Court entered a summary Order denying the Respondent's request for psychological evaluation of the children and a continuance of the final hearing and granting the Petitioner's Expedited Petition for return of the children to Germany. [Doc. 19]. On May 12, 2009, the Petitioner filed a brief and supporting documentation regarding an award of attorney's fees and expenses. [Docs. 20, 21]. Respondent Neves filed a Response to Petitioner's fee application on May 15, 2009. [Doc. 23].

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court now enters the following Memorandum of Decision, setting forth the Court's detailed findings of fact and conclusions of law, and Order entering judgment for the Petitioner.

## II.　FACTUAL BACKGROUND

The following recitation of facts is based upon the evidence of record and the testimony presented at the May 1, 2009 evidentiary hearing.

The Petitioner Susanne Neves is a resident and citizen of Germany. The Respondent Erico Neves is African-American and of partial Jewish descent. He was born in Brazil but is a naturalized United States citizen. He has resided in Germany since 1995.

The parties first met in 1989 and began living together in Brandenburg, Germany in 1996. They were married on November 19, 1997. The parties' first child, J.F.N., was born in 1999 and is currently nine years old. Their second child, F.F.N., was born in 2002 and is currently six years old. The parties traveled to Washington, D.C. for the birth of both children. After each birth, the family immediately returned to their home in Brandenburg, Germany.

In November 2008, the parties separated, and the Petitioner moved with the children to nearby Brielow, Germany to live with the Petitioner's parents. The children continued to attend a private elementary school in Brandenburg, and report cards introduced at the hearing indicate that the children were performing well academically.

Although the parties did not have a written agreement regarding visitation, the parties verbally agreed that Respondent Neves would see the children during some weekends and holidays. J.F.N. had regular visitation with her father at least twice monthly from November 2008 through January 2009. F.F.N. did not want to visit his father on these occasions, but the Petitioner brought F.F.N. with her to drop off and pick up J.F.N. from these visits so that Respondent Neves could at least see and

talk to F.F.N.  In February 2009, both children visited with their father for the first time since the parties' separation.  The Petitioner dropped off the children on Monday, February 2 and picked them up again on Thursday, February 5.  The following day, the Petitioner left F.F.N. to visit with his father over the weekend, and the Respondent took F.F.N. to school the following Monday, February 9.

On Friday, February 13, at Respondent Neves's request, the Petitioner brought the children to visit Respondent Neves at his home in Brandenburg.  The parties agreed that the Petitioner would pick up the children from Respondent Neves's home at 1:00 p.m. on Sunday, February 15.  When Petitioner arrived at Respondent Neves's home to retrieve the children on February 15, however, there was no one there.  The Petitioner repeatedly tried to reach the Respondent by telephone, but was unable to do so.  Fearful that Respondent Neves had harmed the children, the Petitioner called the police.[3]

The police entered Respondent Neves's home and confirmed that the Respondent and the children were not there.  At that time, it was

_____

[3]The Petitioner testified that her fears were based upon (1) a statement made by Respondent Neves at some point in 2008 to the effect that he would rather see the children dead than growing up in Germany and (2) the fact that the Petitioner once had seen Respondent Neves with a gun.

discovered that the children's passports, birth certificates, and school records were missing.

Upon a subsequent search of an email account shared by the parties, the Petitioner found Respondent Neves's February 13, 2009 email correspondence with Respondent Mahesh Patel, in which Respondent Neves states as follows:

> I want to leave Germany with the kids.
>
> Please buy me three tickets from Frankfurt/Main (I want to avoid Berlin airports) to anywhere in the US.
>
> It has to take place as soon as possible for my wife is scheduled to pick up the kids on Sunday at 1:00 PM.
>
> I should be arriving in Frankfurt Saturday around 6:00 PM. Should there be no flight available Saturday night to the US, then we have to leave German soil (Saturday night – to avoid complications) to any place which offer [sic] direct flight to the US. In this case, I believe London is the best option.
>
> However, it might not be. I am open for suggestion, but bear in mind that time [sic] of the essence in this matter.
>
> Please be very discrete [sic] when talking over the phone for I have the suspicion that my phone is being eavesdropped. Preferable I believe we should communicate via E-mail.
>
> If this attempt fails, there will be no second chance. I hope it works out . . . .

[Pet. Ex. 6].  Respondent Patel responded to Respondent Neves's email as follows:

> You cannot buy ticket on line so I have to go through elite services of Delta and buy it old fashion way.  It will take few ours [sic] to get electronic confirmation but it is done.  GOODLUCK! [sic]

[Pet. Ex. 10].  This email correspondence included a link to travel reservations for Respondent Neves and the children from Delta Air Lines, including a departure from Frankfurt, Germany at 9:45 a.m. on February 15, 2009 and an arrival at Charlotte, North Carolina at 5:11 p.m. the same day.  [Pet. Ex. 11].

The Petitioner continued to attempt to contact Respondent Neves but was unable to reach him.  The Petitioner also attempted to contact the Patels, but despite leaving multiple phone messages and sending text messages, the Petitioner never received a response from them.

In an effort to locate the children, the Petitioner retained the services of a private investigator, who eventually located Respondent Neves and the children at the Patels' home in Matthews, North Carolina.  The Petitioner then filed the instant Expedited Petition for Return of Children to Petitioner and Expedited Petition for Immediate Issuance of Show Cause Order to Respondent [Doc. 1].

Subsequent to the filing of this Petition, the Petitioner obtained a decision from the Local Court-Family Court of Brandenburg a.d.H. ("Decision"). The Decision, which is issued by a German court with authority under German law to make determinations applying the Hague Convention, states, in pertinent part (as translated), as follows:

> The removal of the children by the Respondent from their habitual residence in Brielow to the U.S.A. is wrongful according to Article 3 of the Hague Convention, because he breached the joint rights of custody attributed to the Petitioner and the Respondent thereby. The parents exercise the rights of parental custody jointly pursuant to sec. 1626 BGB [German Civil Code]. The Respondent removed the children to the U.S.A. without the knowledge and against the will of the Petitioner. He was not entitled to change the children's habitual residence in the absence of the Petitioner's consent. In particular, he was not entitled to remove the children abroad to a place not known to the Petitioner, thus preventing the Petitioner from exercising the rights of parental custody.
>
> The Petitioner actually exercised the rights of custody. Prior to their removal to the U.S.A. the children habitually resided with the Petitioner.

[Pet. Ex. 12 at 3].

Respondent Neves testified that he brought the children to North Carolina because he was concerned about their safety and welfare in Germany. He testified that J.F.N. in particular was "desperate" to leave

Germany and had threatened to run away from home. Respondent Neves testified that after he brought the children to North Carolina, he asked them every day whether the children wanted to go back to Germany, and that they both cried and said they did not want to return.

Respondent Neves testified that J.F.N. was fearful of being assaulted in school and was scared to go out at night due to racial violence and the prevalence of neo-Nazis in and around Brandenburg. He recounted that he would have to turn the television volume up so his daughter could not hear drunken neo-Nazis singing in the street. Respondent Neves further testified that there had been neo-Nazi rallies in Brandenburg, including one numbering more than 700 people that occurred near the place where J.F.N. took gymnastics. He also recounted one particular incident in September 2007 when the Petitioner was driving home with the children and the police advised her to take a different route to avoid driving the children through a neo-Nazi demonstration. Respondent Neves testified that he never goes out past dark with the children because of the presence of neo-Nazis in the city. He further testified that one New Year's Eve, he was attacked on the street in Berlin by neo-Nazis because of his race.

Respondent Neves further testified that two years ago, when J.F.N. was in public school, she was slapped in the face, bitten, and called a "dirty brownie." He testified that due to this treatment, the parties enrolled the children in a private Christian school, which the children continued to attend until their removal from Germany in February, 2009.

Respondent Neves further testified that the children were exposed to inappropriate nudity and pornographic materials in Germany. Specifically, he described a party where some of the Petitioner's family members swam naked in front of the children and encouraged the children to swim naked as well. Respondent Neves testified that his daughter refused, and the Petitioner thereafter left the party with the children.[4] Respondent Neves further testified that there are frequently pornographic photographs in the German newspapers, and that these newspapers are readily available to the children in the Petitioner's home.

Respondent Neves also testified regarding the strained relations between the children and the Petitioner's parents. Respondent Neves testified that the children hated their grandparents, because they made the children take six-mile long walks around a lake and at bedtime told them to

_____

[4]Respondent Neves did not attend this party and thus did not personally witness this alleged incident. The Petitioner specifically denies that this incident ever occurred.

shut their eyes and not open them until morning. He further recounted that at dinnertime, the grandparents did not allow the children to refuse food and would tell the children how they suffered during the war due to a lack of food.

Respondent Neves testified that the Petitioner's family has not accepted the children because of their race. He testified that the Petitioner's family never talks to the children and has excluded them from family events since 2002. Respondent Neves testified that when he and the children pass the Petitioner's brother-in-law in the stairway of their apartment building, the Petitioner's brother-in-law makes monkey noises at them. He also recounted one incident in 2003 when the Petitioner's sister used a racial epithet and burned his finger with a cigarette during an argument. The Petitioner denies that her family has any animosity toward Respondent Neves or the children because of their race.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Return of Abducted Children Under the Hague Convention

As the Fourth Circuit has explained:

> The Hague Convention, a treaty to which the United States is a signatory party, is by its terms intended "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

> ... to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention art. 1. The Hague Convention provides a mandatory remedy of return that is meant both "to preserve the status quo" with respect to child custody and "to deter parents from crossing international boundaries in search of a more sympathetic court." Miller v. Miller, 240 F.3d 392, 398 (4th Cir.2001) (internal quotations and citation omitted). The United States implemented the Convention's terms by statute in ICARA.

Bader v. Kramer, 445 F.3d 346, 349 (4th Cir. 2006) ("Bader I").

"[A] district court deciding a petition for return of a child has jurisdiction to decide the merits of the wrongful removal claim, but it may not decide the merits of the underlying custody dispute." Kufner v. Kufner, 519 F.3d 33, 38 (1st Cir. 2008); Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). Further, as "the Hague Convention is generally intended to restore the pre-removal status quo and to discourage a parent from engaging in international forum shopping," most Hague Convention petitions "result in the return of the children to their country of habitual residence." Kufner, 519 F.3d at 38.

To secure the return of an abducted child under the Hague Convention, a petitioner must prove by a preponderance of the evidence

that the child was "wrongfully removed." 42 U.S.C. § 11603(e)(1). To establish a "wrongful removal," the petitioner must show: "(1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of [her] home state, and (3) the petitioner had been exercising those rights at the time of removal." Bader I, 445 F.3d at 349; Hague Convention, art. 3.

### 1. "Habitually resident"

The first element that the Petitioner must establish under the Hague Convention is that the children were habitually resident in her home country of Germany prior to their removal to the United States. "A petitioner cannot invoke the protection of the Hague Convention unless the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed to or retained in a different State." Villegas Duran v. Arribada Beaumont, 534 F.3d 142, 146 (2d Cir. 2008) (quoting Gitter v. Gitter, 396 F.3d 124, 130 (2d Cir. 2005)), pet. for cert. filed, 77 U.S.L.W. 3369 (Dec. 12, 2008). "While the Hague Convention does not itself define what it means to be 'habitually resident,'" courts have concluded that the term refers to a child's customary residence

prior to his removal." <u>Antunez-Fernandes v. Connors-Fernandes</u>, 259 F.Supp.2d 800, 810 (N.D. Iowa 2003). In the present case, the parties stipulate that the children resided continuously in Germany prior to their removal to the United States in February 2009, and the Court finds that the evidence supports the parties' stipulation. Accordingly, the Court finds as fact and concludes as a matter of law that the children were habitually resident in Germany at the time of their removal by Respondent Neves.

### 2. Breach of Custody Rights

The second element that the Petitioner must establish is that the children were removed in breach of her custody rights under German law. Under the Hague Convention, "rights of custody" include "rights relating to the care of the [child] and, in particular, the right to determine the child's place of residence. Hague Convention, art. 5a. The Hague Convention distinguishes "rights of custody" from "rights of access," which the Convention defines as "the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention, art. 5b. "Having rights of custody is necessary to petition for return of a child, while having only rights of access does not entitle a party to petition

for the return of a child to the place of habitual residence." <u>Kufner</u>, 519 F.3d at 39.

Under German law, parents who are married at the time of a child's birth have joint custody of the child until the operation of law (such as the death of a parent) or a court order terminates joint custody. <u>Id.</u> The Local Court-Family Court of Brandenburg a.d.H. found in its April 15, 2009 Decision that the parties currently share joint custody of the minor children and thus, the Petitioner has "rights of custody" within the meaning of the Hague Convention. The German Court further found that the Respondent's removal of the children from Germany without the Petitioner's knowledge or consent was in breach of the Petitioner's custody rights under German law. The German Court's findings in this regard are entitled to considerable deference. <u>See</u> <u>Miller v. Miller</u>, 240 F.3d 392, 400-01 (4th Cir. 2001).

For these reasons, the Court finds as fact and concludes as a matter of law that the Petitioner has established by a preponderance of the evidence that she had rights of custody with regard to the children and that the children were removed in breach of her custody rights under German law.

The Court further finds as fact that in removing the children from Germany, Respondent Neves received substantial assistance from Respondents Barthi and Mahesh Patel. The evidence shows that Respondent Neves told Mahesh Patel that he wanted to take the children from Germany without the Petitioner's knowledge. Mahesh Patel made the travel arrangements for the Respondent and the children and paid for the airline tickets. After arriving in the United States, Respondent Neves and the children resided in the Patels' home in Matthews, North Carolina. There is also evidence that the Petitioner made several attempts to contact the Patels regarding the children's whereabouts, but that her phone and text messages went unanswered. Based upon this evidence, the Court finds as fact and concludes as a matter of law that the Patels actively and knowingly assisted Respondent Neves in the wrongful removal and retention of the children, in violation of the Petitioner's rights of custody.

### 3.    Exercise of Custody Rights

The third element that the Petitioner must establish in order to prove a wrongful removal under the Hague Convention is that she had been exercising her rights of custody at the time of removal. "[A] showing of actual exercise [of custody rights] is a necessary element of a claim for

wrongful removal under the Hague Convention." Bader v. Kramer, 484 F.3d 666, 670 (4th Cir. 2007) ("Bader II"). While this term was not defined by the Hague Convention, the Fourth Circuit has found "exercise" to describe "whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Id. at 671 (quoting with approval Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996) ("Friedrich II")). Under this interpretation, "a person who has valid custody rights to a child under the law of the country of the child's habitual residence cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." Bader II, 484 F.3d at 671 (quoting Friedrich II, 78 F.3d at 1066).

The parties stipulate that the Petitioner was exercising her rights of custody at the time of children's removal, and the Court finds that the evidence supports the parties' stipulation. Accordingly, the Court finds as fact and concludes as a matter of law that the Petitioner had been exercising her rights of custody with regard to the children at the time of their removal from Germany.

The Petitioner has shown by a preponderance of the evidence that the minor children were habitually resident in the Petitioner's country of residence at the time of removal; that the removal was in breach of the Petitioner's custody rights under the law of Germany; and that the Petitioner had been exercising those rights at the time of removal. Accordingly, the Court finds as fact and concludes as a matter of law that the Petitioner has established that the children were "wrongfully removed" within the meaning of the Hague Convention and 42 U.S.C. § 11603(e)(1).

### 4.    Showing of Grave Risk of Harm

Respondent Neves opposes the return of the children on the ground that a return to Germany would expose them to a grave risk of physical or psychological harm or otherwise would place them in an intolerable situation.  In this regard, Respondent Neves urges the Court to continue the final hearing of this matter and to order psychological evaluations of the children before determining the removal issue.

Once a showing of wrongful removal has been made, abducted children must be returned unless the respondent can establish one of four defenses.  See 42 U.S.C. § 11603(e)(2); Hague Convention, arts. 12 and 13.  First, a respondent may show by clear and convincing evidence (1)

that return would expose the children to a "grave risk" of "physical or psychological harm or otherwise place them in an intolerable situation" or (2) that return of the children would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms." Miller, 240 F.3d at 398 (internal quotations omitted). Second, a respondent may show by a preponderance of the evidence (1) that the petition for return was filed more than one year after removal and the children are now "well-settled" in their new environment or (2) that the petitioner was not actually exercising his or her custodial rights at the time of removal or had consented or acquiesced to the removal. Id. at 398-99. These exceptions are narrowly construed. Friedrich II, 78 F.3d at 1067. "In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." Id.

With respect to the "grave risk" exception in particular, the Fourth Circuit has acknowledged that

> courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly . . . . When we trust the court system in the abducted-from country, the vast

majority of claims of harm – those that do not rise to the level of gravity required by the Convention – evaporate.

Miller, 240 F.3d at 402 (quoting Friedrich II, 78 F.3d at 1068).

In the present case, Respondent Neves asserts that the children were subjected to physical attacks and other mistreatment by their classmates because of their race.  The Court notes that the evidence on this point was exceedingly weak.  The testimony was that J.F.N. was slapped in the face by a fellow student when she was in the first grade. There was no evidence, only speculation by Respondent Neves, that this incident was racially motivated, or, for that matter, represented anything more than a personality dispute between two first graders that got out of hand.  Even if this incident could be characterized as an act of racial animosity, the evidence shows that this incident, along with the other acts of alleged mistreatment suffered by the children at school, occurred over two years prior to their removal from Germany when they were enrolled in public school.  The children have since been enrolled in a private school, where they are performing well academically, and there is no evidence that they have been subjected to any kind of mistreatment by their classmates in their new environment.  Accordingly, the Court finds that these incidents

of alleged racial animosity do not constitute evidence that the children face a grave risk of physical or psychological harm upon return to Germany or that return of the children would place them in an intolerable situation.

Respondent Neves further asserts that the children are subject to a grave risk of psychological harm due to the prevalence of pornographic images in the German media. There can be no doubt that the exposure of young children to photographs of nude adults, particularly in a sexual context, can present problems to the children's psychological development. The only evidence presented, however, was that such photographs appeared only occasionally in local newspapers, and while Respondent Neves testified that these newspapers were readily available to the children in the Petitioner's home, there was no evidence that such offensive photographs were actually viewed by the children. As parents, the parties have a duty to minimize their children's exposure to material that they as parents believe to be physically or psychologically harmful. In the case of graphic or other otherwise inappropriate images in the newspapers, parents can satisfy this duty by reviewing the newspapers before the children and not allowing their children access to them if they contain any such offensive materials. The evidence in this case reflects

that the parties have endeavored to do just that.[5]  The Court finds that

there is no clear and convincing evidence that the children are subject to a

grave risk of psychological harm or an intolerable situation because of their

exposure to pornographic or otherwise inappropriate images in Germany.

Respondent Neves also complains of an incident at a pool party

where some of the Petitioner's relatives swam naked in front of the children

and encouraged the children to do so.  The Court does not find the

evidence presented to constitute clear and convincing evidence of a grave

risk of psychological harm to the children.  First, the Court notes that

Respondent Neves attempted to prove this incident by relying upon prior

statements of the Petitioner.  The Petitioner, however, denies that this

incident even took place.  In light of this conflicting evidence, the Court

does not find Respondent Neves's evidence on this point to be either clear

or convincing.  Furthermore, in recounting the incident, Respondent Neves

testified that his daughter refused to swim with the adults, and the

Petitioner promptly left the party with the children.  As such, even

---

[5]Moreover, one of the two examples Respondent Neves offered as evidence of such photographs appearing in a newspaper was from two years prior to his removal of the children.  This raises the question of why Respondent Neves kept this particular newspaper so long, and leads the Court to the conclusion that Respondent Neves' evidence on this point is at least somewhat contrived and his argument exaggerated.

Respondent Neves' version of the incident shows that the Petitioner handled the situation in a manner so as to minimize any particular risk to the children. Thus, even assuming that this incident occurred, Respondent Neves has failed to demonstrate that this single evidence constitutes a "grave risk" of psychological harm to the children.

Further, the Court finds that there is no clear and convincing evidence that continued exposure to the Petitioner's family poses a grave risk of physical or psychological harm or otherwise places the children in an intolerable situation. While the children's grandparents may be zealous in their pursuit of the children's physical fitness and somewhat strict in their discipline, there is no evidence that they pose any serious risk of harm to the children. Moreover, while the actions of the Petitioner's sister and brother-in-law may be unfortunate and ill-considered,[6] they do not rise to the level of creating a grave risk of physical or psychological harm. To the extent that the attitudes and actions of the Petitioner's family may be harmful to the children, the German courts are clearly capable of adequately protecting the children from such harm. See Miller, 240 F.3d at 403 ("we are confident that if Ms. Miller truly poses a danger to her

_____

[6]In fact, in American society and probably in most of German society, these actions, based on their inherent racial prejudice, would be considered ignorant.

25

children, the Ontario courts are ready and able to take every step to protect them").

Finally, while the existence of neo-Nazi groups is disturbing, and the acts of racial prejudice and animosity described by Respondent Neves are certainly warranting of condemnation, there simply is no clear and convincing evidence before the Court to show that the racial situation in Germany is intolerable or that there is a grave risk of physical or psychological harm to the children in returning to this environment.[7]  This is particularly true in light of the evidence presented showing that the local authorities acted to shield the children from any such incidents.

For these reasons, the Court concludes that Respondent Neves has failed to establish by clear and convincing evidence that return of the children would subject them to a "grave risk [of] physical or psychological harm or otherwise place [them] in an intolerable situation."  Hague Convention, art. 13b; 42 U.S.C. § 11603(e)(2)(A).

Respondent Neves urges the Court to continue this matter in order to obtain psychological evaluations of the children to assess the extent of the

---

[7]  It should be noted that even in this country persons harboring racist views have certain rights allowing the expression of those views, even though the vast majority of the population would see such views as morally repugnant.  See National Socialist Party v. Skokie, 432 U.S. 32 (1977).

risk of harm posed by their return to Germany.  In its discretion, the Court

declines to do so.  While psychological evaluations may be relevant in

assessing the risk of harm in only very narrow and limited circumstances,

see Friedrich II, 78 F.3d at 1069 & n.10, such evaluations are rarely

dispositive.  Moreover, no evidence has been presented that would place

this case among those narrow circumstances where psychological

evaluations would assist the Court in making any of the determinations at

hand.  Given the age of these children, the Court considers it highly

unlikely that psychological testing would reveal any more information

regarding the children's psychological and emotional state than that which

has already be gleaned from the testimony of the parents.   In short,

Respondent Neves' request that this Court order psychological evaluations

rests purely on Respondent's own conjecture.

Further, delaying the children's return to Germany for the purpose of

conducting psychological evaluations would frustrate the underlying

purpose of the Hague Convention, which is to ensure the prompt return of

abducted children.  See Bader I, 445 F.3d at 349.  Without a doubt, these

children have been subjected to a significant amount of turmoil in the past

few months, and the Court is reluctant to prolong this turmoil by delaying

resolution of this proceeding any further. For these reasons, Respondent Neves's requests for psychological evaluations of the children and for a continuance of these proceedings are denied.

## IV.  AWARD OF ATTORNEY'S FEES AND EXPENSES

With respect to the award of attorney's fees and costs, ICARA provides, in pertinent part, as follows:

> Any Court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such an award would be clearly inappropriate.

42 U.S.C. § 11607(b)(3). An award of fees and costs serves two purposes: (1) "to restore the applicant to the financial position he or she would have been in had there been no removal or retention" and (2) "to deter such removal or retention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10511 (Mar. 26, 1986).

## A.    Attorney's Fees

The determination of a reasonable attorney's fee is a matter of discretion with the Court.  See Robinson v. Equifax Info. Services, 560 F.3d 235, 243 (4th Cir. 2009). In determining the amount of reasonable attorney's fees to award under ICARA, federal courts typically apply the lodestar method.  See Wasniewski v. Grzelak-Johannsen, 549 F.Supp.2d 965, 971 n.5 (N.D. Ohio 2008); Distler v. Distler, 26 F.Supp.2d 723, 727 (D.N.J. 1998); Freier v. Freier, 985 F.Supp. 710, 712 (E.D. Mich. 1997); Berendsen v. Nichols, 938 F.Supp. 737, 738 (D. Kan. 1996); Flynn v. Borders, No. 5:06-323-JMH, 2007 WL 862548, at *2 (E.D. Ky. Mar. 20, 2007); Friedrich v. Thompson, No. 1:99-CV-772, 1999 WL 33951234, at *3 (M.D.N.C. Nov. 26, 1999).  Under the lodestar method, the Court multiplies the number of reasonable hours expended by a reasonable hourly rate. Robinson, 560 F.3d at 243.  In determining what is "reasonable," the Fourth Circuit has instructed that a district court's discretion should be guided by the following factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation;

(7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Grissom v. The Mills Corp., 549 F.3d 313, 321 (4th Cir. 2008). After determining the lodestar amount, "the court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones." Id. (quoting Johnson v. City of Aiken, 278 F.3d 333, 337 (4th Cir. 2002)). "Once the court has subtracted the fees incurred for unsuccessful, unrelated claims, it then awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." Grissom, 549 F.3d at 321 (quoting Johnson, 278 F.3d at 337.

The party seeking an award of attorney's fees must submit adequate evidence detailing the hours worked and the rates claimed. Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Where the attorney's documentation is inadequate, or the claimed hours are duplicative or excessive, the court may reduce the award accordingly. Wasniewski, 549 F.Supp.2d at 972. "The goal is to not overcompensate

counsel with a 'liberal' fee, but to award the 'reasonable' fee necessary to encourage competent lawyers to undertake the representation."  Id.

### 1.    Reasonable Hourly Rate

In support of her fee application, the Petitioner has submitted the Affidavits of attorneys Irene P. King and Linda Shay Gardner.  [Amended Affidavit for Attorney's Fees and Expenses ("King Aff."), Doc. 21 and Affidavit on Fees ("Gardner Aff."), Doc. 21-2].  Ms. King is an associate with the law firm of James, McElroy & Diehl, P.A., located in Charlotte, North Carolina.  [King Aff., Doc. 21 at ¶1].  She has been licensed to practice in the State of North Carolina since 2004.  [Id.].  Her practice consists entirely of litigation, with a focus on family law, including complex child custody and other child-related issues.  [Id. at ¶6].  Ms. King's usual hourly rate is $200.00 per hour.  [Id. at ¶4].  Ms. King states in her Affidavit that she is familiar with the hourly rates charged by lawyers with similar experience and abilities in domestic relations law in Charlotte, North Carolina, and that these lawyers typically charge between $175.00 to $250.00 per hour. [Id. at ¶6].

Attorney John P. Davis, an associate in the firm who assisted Ms. King in this case, currently bills at a rate of $175.00 per hour. [Id. at ¶4].

Mr. Davis was admitted to the North Carolina Bar in 2005, and his practice consists entirely of litigation, with a focus on federal civil and white collar criminal litigation. [Id. at ¶6].  Ms. King states in her Affidavit that lawyers in Charlotte, North Carolina with similar experience and background to Mr. Davis typically charge between $150.00 to $200.00 per hour.  [Id.].

Attorney Preston O. Odom, a partner in the firm who also assisted Ms. King in this matter, currently bills at a rate of $300.00 per hour.  [Id. at ¶4].  He was admitted to the Florida Bar in 1997 and the North Carolina Bar in 2000.  [Id. at ¶6].  He maintains a litigation support practice, with an emphasis in appellate litigation.  [Id.].  Ms. King states in her Affidavit that she is aware that charges by lawyers with similar experience and background to Mr. Odom range from approximately $250.00 per hour to $350.00 per hour in Charlotte, North Carolina.  [Id.].

Attorney Linda Shay Gardner has been licensed in the Commonwealth of Pennsylvania since 1996, and in the State of New Jersey since 1995.  [Gardner Aff., Doc. 21-2 at ¶1].  She was granted *pro hac vice* admission to the bar of this Court for the purpose of appearing in this litigation.  [Doc. 5].  Since her admission to the New Jersey Bar, Ms. Gardner has handled numerous cases involving interstate and international

32

child abduction. [Gardner Aff., Doc. 21-2 at ¶2]. She is a Fellow of the

International Academy of Matrimonial Lawyers, has presented at numerous

conferences on various abduction matters, and has testified before

tribunals and legislative bodies regarding issues relating to child abduction

and family law. [Id. at ¶¶8-13]. Ms. Gardner has worked on child abduction

cases involving 47 different countries and has been involved in at least

seven cases which resulted in published opinions regarding the Hague

Convention. [Id. at ¶¶7, 15]. Ms. Gardener's standard hourly rate is

$325.00 per hour. [Id. at ¶23]. Ms. Gardner states in her Affidavit that she

believes her hourly rate is consistent with other practitioners who litigate

Hague Convention cases, and that in many cases, her fees are less than

those of other attorneys with equal or less experience. [Id. at ¶37].

Notably, the Petitioner did not file any affidavits from other attorneys

regarding the prevailing market rates of attorneys in the Western District of

North Carolina for similar cases involving the Hague Convention. As the

Fourth Circuit has recognized:

> [D]etermination of the hourly rate will generally be the
> critical inquiry in setting the reasonable fee, and the
> burden rests with the fee applicant to establish the
> reasonableness of a requested rate. *In addition to
> the attorney's own affidavits, the fee applicant must
> produce satisfactory specific evidence of the*

33

> *prevailing market rates in the relevant community for*
> *the type of work for which he seeks an award.*
> Although the determination of a market rate in the
> legal profession is inherently problematic, as wide
> variations in skill and reputation render the usual laws
> of supply and demand largely inapplicable, the Court
> has nonetheless emphasized that market rate should
> guide the fee inquiry.

Robinson, 560 F.3d at 244 (quoting Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990) (emphasis in Robinson). Accordingly, the evidence supplied by the Petitioner's attorneys regarding the prevailing market rate, without more, is inadequate to support the attorney's fee award sought by the Petitioner. See Robinson, 560 F.3d at 246 (holding district court abused its discretion in awarding fee where court relied solely on affidavit of plaintiff's attorney in determining prevailing market rate); Grissom, 549 F.3d at 322-23 (same). In the absence of specific evidence regarding the prevailing market rate, the Court may establish a reasonable rate based upon its own knowledge and experience of the relevant market, which in this case would be the Western District of North Carolina. See Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 179 (4th Cir 1994) ("[T]he community in which the court sits is the first place to look to in evaluating the prevailing market rate.").

Based upon the Court's own knowledge and experience of the relevant market, the Court will base the attorney's fee award to the Petitioner upon the following reduced rates:

| | |
|---|---|
| Irene P. King | $175 per hour |
| John P. Davis | $150 per hour |
| Preston O. Odom | $150 per hour[8] |
| Linda S. Gardner | $275 per hour |

The Court finds that these adjusted rates are commensurate with the market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Hadix v. Johnson, 65 F.3d 532, 536 (6th Cir. 1995) (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

## 2. Reasonable Hours Expended

In the present case, the Petitioner relies upon the Affidavits of attorneys Irene King and Linda Shay Gardner and detailed billings records

---

[8]The Petitioner presented evidence that Mr. Odom's usual hourly rate is $300.00 per hour, based presumably on the fact that he is a partner in the firm and his practice consists primarily of appellate litigation. The billing records reflect, however, that Mr. Odom's participation in this case consisted of performing legal research on a general legal issue and discussing his findings with Ms. King. There has been no showing that these tasks could not have been performed by an associate attorney with less specialized experience and a corresponding lower hourly rate. For these reasons, the Court sets Mr. Odom's hourly rate at the same hourly rate assigned to Mr. Davis.

to establish the number of hours expended by the four attorneys who worked on this matter.  [King Aff., Doc. 21; Gardner Aff., Doc. 21-2].

Attorney Irene King served as lead counsel on this case and claims a total of 95.6 hours.  Ms. King was involved in the drafting of most of the pleadings filed in this case and appeared on behalf of the Petitioner at every stage of the Court's proceedings.  [Doc. 21 at 3-7].  Attorney John P. Davis reports a total of 24.2 hours of work on this case.  According to the billing records, Mr. Davis performed legal research, drafted briefs, and had numerous conferences with Ms. King regarding case strategy. [Id.].  Attorney Preston O. Odom reports a total of 1.1 hours on this case.  Mr. Odom performed legal research on the issue of general appearances, and discussed his research results with Ms. King.  [Doc. 21 at 6].

Attorney Linda Shay Gardner claims a total of 22.9 hours of work on this matter.  Ms. Gardner was the first American attorney retained by the Petitioner in this matter.  After it was determined that the Respondent was in North Carolina, Ms. Gardner endeavored to find local counsel to assist in this case.  [Gardner Aff., Doc. 21-2 at ¶¶22-26].  Ms. Gardner states that it was difficult to find local counsel, as she was initially unable to find attorneys willing to assist in the case who were familiar with the Hague

Convention and who were willing to assist where the recovery of costs and fees was based on statutory entitlement and where advanced payment of fees would be limited. [Id. at ¶27]. Eventually, Ms. Gardner located Ms. King, who ultimately served as lead counsel in this case. [Id. at ¶28]. Ms. Gardner assisted Ms. King throughout the litigation, providing her with information regarding procedure and legal arguments. [Id. at ¶29]. Ms. Gardner also coordinated contact with the Petitioner, the Petitioner's counsel in Germany, the private investigator who located the Respondent and the children, and the United States State Department in Washington, D.C. [Id. at ¶30].

In reviewing the reasonableness of the hours expended, the Court is mindful that Hague Convention cases often present novel and complex legal issues of child custody and international law that most attorneys do not routinely handle. See Flynn, 2007 WL 862548, at *3 (noting that petitions under the Hague Convention "are fairly rare cases" involving novel legal issues). Additionally, cases involving child abduction are necessarily time-sensitive, and this case was no exception in that regard.

Given the complexity of the issues involved and the time limitations imposed by the circumstances of the case, the Court finds a certain

amount of consultation among the Petitioner's attorneys to be reasonable. See Wasniewski, 549 F.Supp.2d at 976 (noting that a complex case often requires some consultation with co-counsel). The Court, however, finds the time that each attorney billed for conferencing and coordinating with co-counsel to be somewhat redundant and duplicative. "In complicated cases, involving many lawyers, deducting a small percentage of the total hours may be used to eliminate duplication of services." Freier, 985 F.Supp. at 712. Accordingly, the Court will reduce the overall attorney's fee award by twenty percent (20%) to account for this redundant and duplicative billing. See, e.g., Aldinger v. Segler, 338 F.Supp.2d 296, 298 (D.P.R. 2004) (reducing fee award by 50% when approximately 20% of attorney's time was spent on non-necessary matters and where billing records contained excessive entries for conferencing and coordinating with local counsel and counsel in Germany).

### 3. Attorney's Fees for German Counsel

The Petitioner also seeks an award of $5,822.33 for legal fees that she has incurred in Germany. Specifically, she seeks to recover $418.21 (316.18 €) for legal consultation with attorney Ines Weidemann. [Doc. 21 at 8; Doc. 21-10]. Because Dr. Weidemann's bill is in German, however,

the Court cannot determine the exact nature of the legal services rendered to the Petitioner.  The Court is able to discern from this billing that whatever services were rendered were performed between November 20, 2008 and February 27, 2009.  As the children were not abducted until February 15, 2009, the Court concludes that the Petitioner has failed to show whether Dr. Weidemann's services were "necessary expenses . . . related to the return of the child[ren]," 42 U.S.C. § 11607(b)(3), or whether these services relate to the underlying divorce and custody proceeding which is currently pending in Germany.  See Distler, 26 F.Supp.2d at 728 (reducing attorney's fee by a third for work performed related to ongoing custody case in Israel; such work was not "necessary" to Hague Convention proceeding in the United States).

The Petitioner also seeks to recover $5,212.87 (3,941.61 €) for legal fees and $191.25 (144.59 €) for translation expenses that were charged by attorney Kerstin Niethammer-Jürgens. [Doc. 21 at 8].  The Petitioner submits a letter from Dr. Niethammer-Jürgens, which has been translated into English, and which states that the Petitioner has incurred legal fees from February 25, 2009 through April 28, 2009 "in regard to the abduction of [her] children ...." [Doc. 21-11 at 2].  Additionally, the letter states that

the Petitioner is responsible for the costs of a translator, presumably for the translation of the Decision of the German Court regarding the Respondent's wrongful removal of the children. The billing records which accompany this letter, however, are in German and no translation has been provided. As such, the Court cannot discern whether the legal services provided by Dr. Niethammer-Jürgens were necessary to the Hague Convention proceeding. Furthermore, there has been no evidence provided to establish whether the hourly rate charged by Dr. Niethammer-Jürgens (which appears to be 230 €) is reasonable.

For these reasons, while the Court will allow the Petitioner to recover the costs of translation charged by Dr. Niethammer-Jürgens, the Court finds that the Petitioner has failed to show that the other legal expenses that she incurred in Germany were necessary expenses related to this case, nor has she shown that such expenses were reasonable. Accordingly, aside from the $191.25 claimed in translation expenses, the Court will not include these legal costs in the Petitioner's award.

### 4.    Attorney's Fee Award – Conclusion

For the foregoing reasons, the Court calculates the attorney's fee award to the Petitioner as follows:

| | |
|---|---:|
| Irene P. King  (95.6 hours @ $175/hour) | $16,730.00 |
| John P. Davis (24.2 hours @ $150/hour) | 3,630.00 |
| Preston O. Odom (1.1 hours @ $150/hour) | 165.00 |
| Linda S. Gardner (22.9 hours @ $275/hour) | 6,297.50 |
| **Subtotal** | $26,822.50 |
| 20% reduction for duplicative billing | (5,364.50) |
| Legal fees incurred in Germany (translation costs only) | 191.25 |
| **TOTAL ATTORNEY'S FEE AWARD** | **$21,649.25** |

The Court finds that this amount is reasonable in light of the time spent by the attorneys and the complexity of the legal issues involved in this case. The Court further finds that this award is commensurate with fee awards given in other Hague Convention cases.  See Willing v. Purtill, No. 07-1618-AA, 2008 WL 299073, at *1 (D. Or. Jan. 31, 2008) (awarding $28,669.95 in attorney's fees under ICARA); Lebiedzinski v. Crane, No. A03-0248 CV (JKS), 2005 WL 906368, at *4 (D. Alaska Apr. 13, 2005) (awarding $26,877.96 in attorney's fees under ICARA).

### B.    Other Expenses

The Petitioner claims a total of $18,350.11 in various other expenses that she incurred in securing the return of the children, including $3,633.18

in airfare[9]; $110.00 in cab fare; $3,666.13 in lodging expenses; $10,324.65 in investigative services fees; $600.00 in filing fees and court costs; and $16.15 in postage. The Court has reviewed the supporting documentation for each of these claimed costs, and finds these expenses to be reasonable and necessary to the Petitioner's efforts to have the children returned to Germany under the Hague Convention.

### C. Would Award Be "Clearly Inappropriate"?

Under ICARA, the Court is required to award the Petitioner's necessary fees and costs incurred unless such award "would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). By providing for an award of attorney's fees and costs after a finding of wrongful removal or retention of a child, ICARA "contemplates the use of such awards as a deterrent to violations of the Convention." Friedrich, 1999 WL 33951234, at *2. The Respondent bears the burden of establishing that an award of fees and

---

[9]The Petitioner has submitted two receipts from US Airways: one for her trip from Germany to North Carolina, and another for her return trip from North Carolina to Germany. During both trips, the Petitioner was accompanied by her sister. Thus, the Petitioner appropriately reduced the invoiced amount by the cost of the sister's portion of the fare (1/2 on the first trip and 1/4 on the return trip with the children). The Petitioner made a mathematical error in calculating the reduction on the return trip, however, claiming only $2,775.80. The correct amount is $2,776.20, which when added to the amount of the Petitioner's portion of the fare from the first trip ($856.98) amounts to a total of $3,633.18.

costs would be clearly inappropriate under the circumstances.  Whallon v. Lyon, 356 F.3d 138, 140 (1st Cir. 2004).

Respondent Neves first argues that an award of fees and costs would be clearly inappropriate because he removed the children in a good faith effort to protect them from the intense racial division prevalent in German society.  [Doc. 23 at 1-2].  As the Court has previously explained, however, the racial prejudice experienced by Respondent Neves and the children in Germany, while condemnable, does not serve to justify Respondent Neves's abduction of his children without the knowledge or consent of his estranged wife.  Respondent's asserted good faith in abducting the children does not render an award reimbursing the Petitioner for the expenses she incurred in securing the return of the children "clearly inappropriate."  See Maynard v. Maynard, No. 07-10155, 2007 WL 1869253, at *2 (E.D. Mich. June 28, 2007) ("Respondent's attempt to rehash the merits of the parties' dispute does not in any way address why the amounts requested by Petitioner 'would be clearly inappropriate.'").

Next, Respondent Neves argues that he has no money, no assets, no home, and no job as of yet in the United States and thus has no means by which to pay any award to the Petitioner.  Respondent Neves argues

that the only asset that he owns is a two-story building in Brandenburg, Germany, where the Petitioner and the children currently live. Respondent Neves estimates that the Petitioner is saving approximately $2,000 in rent by occupying and controlling this property. [Doc. 23 at 2-3].

ICARA gives courts the discretion to reduce or even eliminate a respondent's obligation to pay a prevailing petitioner's attorney's fees and costs where such an award "would be clearly inappropriate." Distler, 26 F.Supp.2d at 729 (quoting 42 U.S.C. § 11607(b)(3)); see also Silverman v. Silverman, No. Civ. 00-2274 JRT, 2004 WL 2066778, at *4 (D. Minn. Aug. 26, 2004) (eliminating fee where respondent had no ability to pay, and prevailing petitioner did not abide by prior court orders, had failed to support children financially in the past, and had been physically and mentally abusive to respondent). Exercising this discretion, courts have reduced awards based upon a respondent's financial circumstances. See Rydder v. Rydder, 49 F.3d 369, 373-74 (8th Cir. 1995) (reducing fee award by 46% due to respondent's "straitened financial circumstances"); Berendsen, 938 F.Supp. at 739 (reducing award by 15% in light of respondent's financial condition and because awarding full fee would unduly limit respondent's ability to support his children); Willing, 2008 WL

299073, at *1 (reducing fee award by 15% due to respondent's financial circumstances, particularly his unemployment).

While Respondent Neves is currently unemployed and has no assets to speak of in the United States, he does own a two-story building in Germany, which he estimates would rent for approximately $2,000 per month. The Court finds that this property is a substantial asset from which Respondent Neves can satisfy his obligation to the Petitioner, despite his current unemployment. See Distler, 26 F.Supp.2d at 729 (finding award not "clearly inappropriate" where award could be satisfied by respondent's share of equity in marital residence in Israel).

Finally, Respondent Neves argues that an award against the Respondent Patels would be clearly inappropriate because the Patels "had almost nothing to do with [his] decisions or conduct in this matter." [Doc. 23 at 3]. As discussed later in this opinion, the Court agrees that the Patels had a limited role in Respondent Neves's wrongful removal of his children and will reduce the amount of the award apportioned to them accordingly. The Court finds, however, that without their assistance, Respondent Neves would not have been able to carry out his plan to wrongfully remove the children from Germany without the Petitioner's

knowledge or consent.  Under the circumstances, the Court does not find that the Patels' limited involvement renders such an award clearly inappropriate.

### D.    Allocation of Award Between Respondents

Finally, the Court must determine the most appropriate means of apportioning this fee and costs award among the Respondents.  The Petitioner urges the Court to hold the Respondents jointly and severally liable for the award.  [Doc. 20 at 4-5].  Respondent does not specifically address the issue of allocation in his Response, and as indicated previously, the Respondent Patels have not appeared in this action.

As with the determination of a reasonable attorney's fee, the Court has broad discretion in the allocation of attorney's fees.  See Council for Periodical Distributors Associations v. Evans, 827 F.2d 1483, 1487-88 (11th Cir. 1987); Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 959 (1st Cir. 1984).  As the Eleventh Circuit has explained:

> There are many possible methods and theories with which to apportion fees.  Most simply, in cases with roughly equal wrongdoers in which the court does not want to impose joint and several liability for attorney's fees, the fees can be divided equally among the defendants.  Fees can be divided according to relative culpability of the various defendants.  A court may decide to award fees in the same proportions as

a jury assessed actual damages. It may be more appropriate for fees to be apportioned according to the time spent by the plaintiff in preparing the case against each defendant. A specific defendant could be charged with the added fees incurred because of the defendant's participation in the defense of the case. When one defendant is solely or largely responsible for a single claim within a litigation, a court may hold that defendant liable for fees related to that claim. Finally, a district court may decide that it is appropriate to combine two or more of these methods, depending on the facts and nature of the case . . . .

\* \* \*

We realize that a number of the methods for apportionment discussed above only lead to approximations of the "best" division of fees, and that certain methods may be inappropriate in some cases because of the difficulty in calculating even a good approximation. Nevertheless, in apportioning attorney's fees, district courts should make every effort to achieve the most fair and sensible solution that is possible. We do not mean to encourage a complex mini-litigation on attorney's fees. Instead, we ask the district court to make the best possible assessment consistent with both efficiency and fairness.

Evans, 827 F.2d at 1487-88 (internal quotation marks and citations omitted).

Upon consideration of the evidence, and in an attempt to "achieve the most fair and sensible solution that is possible," id. at 1488, the Court declines to hold the Respondents jointly and severally liable for the entire

award of fees and costs.  Rather, the Court finds that the Respondents Barthi and Mahesh Patel should be liable only for a portion of the award to Petitioner.  As the biological father and joint custodian of the children, Respondent Neves clearly was the driving force behind the children's wrongful removal to the United States.  The Patels, on the other hand, are not related to the children and presumably have no stake in the outcome of the custody case that is currently pending in Germany.  Nevertheless, the Court is mindful that the Patels' assistance was integral to Respondent Neves's plans.  Mahesh Patel made the travel arrangements for Respondent Neves to leave Germany with the children, and the email correspondence between Mr. Patel and Respondent Neves indicates that he did so knowing that the Petitioner was unaware of the children's removal.  Once Respondent Neves arrived in the United States with the children, the Patels further assisted Respondent Neves by allowing him and the children to reside in their home in Matthews, North Carolina.  Further, despite numerous attempts by the Petitioner to contact the Patels, they made no effort to let the Petitioner know the whereabouts of her children.  For these reasons, while the Court finds that Respondent Neves is primarily culpable for the wrongful removal of the children, the Court

determines that the Patels are also culpable and therefore should be held liable for at least part of the fees and costs awarded to the Petitioner. Accordingly, of the total amount of fees and costs awarded to the Petitioner ($39,999.36, consisting of $21,649.25 in fees plus $18,350.11 in expenses), the Respondents Barthi and Mahesh Patel shall be jointly and severally liable to the Petitioner for fifteen percent (15%) of that award, or $5,999.90, and Respondent Neves shall be liable to the Petitioner for eighty-five percent (85%) of that award, or $33,999.46.

## V.  CONCLUSION

The Court finds that the Petitioner has proved by a preponderance of the evidence (1) that the children were "habitually resident" in the Petitioner's country of residence of Germany at the time of removal; (2) that the removal of the children was in breach of the Petitioner's custody rights under the law of her home state; and (3) that the Petitioner had been exercising those rights at the time of removal.  Accordingly, the Court concludes as a matter of law that the parties' children were "wrongfully removed" within the meaning of Article 3 of the Hague Convention and ICARA, 42 U.S.C. § 11603(e)(1).  The Court further finds that the Respondent has failed to establish by clear and convincing evidence that

return of the children would subject them to a "grave risk [of] physical or psychological harm or otherwise place [them] in an intolerable situation." Hague Convention, art. 13b; 42 U.S.C. § 11603(e)(2)(A).

The Court further finds that the Petitioner has incurred "expenses . . . related to the return of the child[ren]" in the amount of $39,999.36 and that an award of these expenses to the Petitioner would not be "clearly inappropriate." 42 U.S.C. § 11607(b)(3). Of the total amount of fees and costs awarded to the Petitioner, Respondent Neves shall be liable to the Petitioner for eighty-five percent (85%) of that award, or $33,999.46, and the Respondents Barthi and Mahesh Patel shall be jointly and severally liable to the Petitioner for fifteen percent (15%) of that award, or $5,999.90.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Petitioner's Expedited Petition for Return of Children to Petitioner and Expedited Petition for Immediate Issuance of Show Cause Order to Respondent [Doc. 1] is **GRANTED**, and judgment shall be entered in favor of the Petitioner. The Petitioner shall forthwith return to Germany with the children and shall seek the determination of the German Courts regarding the custody, support,

and visitation of the children.  The Respondents shall not interfere in any respect with such return.

**IT IS FURTHER ORDERED** that the Respondent's Motion for Continuance [Doc. 14] is **DENIED**.

**IT IS FURTHER ORDERED** that the Petitioner's Application for Attorney Fees and Expenses [Doc. 20] is **GRANTED**, and the Petitioner Susanne Neves is hereby awarded $33,999.46 against the Respondent Erico Ferreira Neves, and $5,999.90 against the Respondents Barthi Patel and Mahesh Patel, jointly and severally, for attorney's fees and other expenses incurred in prosecuting the Petition.

A Judgment consistent with this Memorandum of Decision and Order shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: May 29, 2009

Martin Reidinger
United States District Judge